### 5326.   HIGHTOWER *v.* THE STATE.

1. There was evidence on the part of the prosecution which authorized a conviction of the offense of voluntary manslaughter; and hence it was proper to instruct the jury upon that phase of the case. The instructions upon the subject of voluntary manslaughter were not, for any of the reasons assigned, erroneous.

2. Instructions upon the law relating to impeachment of witnesses are not required, in the absence of a timely and appropriate written request. And when the instruction upon the subject of impeachment, as given without a request, is abstractly correct, and not apparently prejudicial, the fact that fuller instructions upon the subject could properly have been given will not require the grant of a new trial, in the absence of a written request calling the attention of the court to the propositions which have been omitted and which it is contended are material. Since the trial judge, in the absence of a written request, is not required to charge upon the subject of impeachment at all, correct instructions as to the legal modes by which a witness may be impeached are not vitiated, in the absence of a written request, by failure to tell the jury that if the witness has been successfully impeached, and found to be unworthy

of belief, the jury may wholly disregard his testimony, and that if sat-
isfied that the witness has wilfully and knowingly sworn falsely to one
material fact, they will be authorized to disbelieve him as to every
matter on which he has testified.

3. In a generic sense the term "man" includes "woman," and the pronoun
"he" includes a person of the feminine gender.  Civil Code, § 4 (3).

4. The degree of strictness to be applied in enforcing the rule requiring the
sequestration of witnesses is a matter addressed wholly to the discretion
of the trial judge.  This discretion may be abused where, by permitting
persons actively interested in the result of the case to intermingle with
witnesses who have been ordered to be sequestered, there is a probability
that their testimony may be influenced and moulded to the prejudice of
either of the parties in the cause.  And though a trial judge may not
exclude the testimony of a witness where the separation of the witnesses
has been ordered and where the order of sequestration has been dis-
obeyed, it is the duty of the court to enforce a rigid adherence to the
letter of the rule, where his attention is directed in advance to an im-
pending violation of the party's right to have the witnesses sequestered,
and where it is shown that a denial or abridgment of this right may be
prejudicial in its result.  It would have been error in the present case
to permit the real, though not the nominal, prosecutor to accompany
the solicitor-general and be present during the latter's conference with
two of the witnesses for the State, which was not in the presence of
the court, and to accompany each of these witnesses as they severally
came to the stand from the room in which they had been sequestered
and into the court-room, if an objection to the proposed conduct of the
prosecutor and to his having any contact or communication with the
witnesses had been made before the incident, and even in anticipation
of the probability of his presence influencing the witnesses; but no
objection was made until after the prosecutor had gone into the presence
of the sequestered witnesses, and the court could not grant the motion to
exclude the testimony of these witnesses.

5. The accused not having put her character in issue, and there being no
evidence to establish a causal connection between the specific act of im-
morality alleged to have been admitted by her and the homicide, it was
error, prejudicial to her right to a fair and impartial trial, to overrule
a timely motion to exclude testimony to the effect that the defendant
had admitted to the witness that she had sexual intercourse with one
other than her husband.  The admission related to an act committed at
a time and place different from that of the homicide; it was not a part
of the res gestæ; and it did not illustrate the motive which actuated the
defendant in the assault that caused the death of her husband, or aid
the jury in determining whether the killing was murder, manslaughter,
or justifiable homicide.  The objection should have been sustained and
the testimony promptly and effectually excluded from the consideration
of the jury.

DECIDED JANUARY 20, 1914.

Indictment for murder; from Jasper superior court—Judge
James B. Park.  October 30, 1913.

*A. S. Thurman,* for plaintiff in error.

*J. E. Pottle, solicitor-general,* contra.

Russell, C. J. 1. Elizabeth Hightower was indicted for the murder of her husband, Ed Hightower, and was convicted of voluntary manslaughter. Her motion for a new trial was overruled, and exception is taken to that judgment. It is needless to discuss the general grounds of the motion for a new trial, because a careful review of the testimony discloses sufficient evidence to authorize the jury to return the verdict rendered; and the contention of learned counsel for the plaintiff in error, that the evidence demanded either that the defendant be convicted of murder or acquitted, is not sustained by the record. For the same reason the various assignments complaining of error in that portion of the charge of the court which relates to the subject of voluntary manslaughter are without merit. It is true that the testimony for the defendant, and her own statement, would have authorized an acquittal, and that the testimony for the prosecution, including the alleged dying declaration of the deceased, might have required a verdict of guilty of murder, but an analysis of the testimony shows plainly that even if the jury gave the preference to the testimony in behalf of the State, a verdict finding the defendant guilty of murder was not demanded, and that, conceding to the jury their right to determine the credibility of all the witnesses, there is sufficient evidence to authorize the verdict finding the defendant guilty of voluntary manslaughter. Superficially, it would seem that a finding for murder would be demanded as a result of giving credence to the witnesses who testified in behalf of the State, but since the jury are now, by statute, the exclusive judges of what is "cooling time," it is not, as it formerly was, within the province of the court to determine, as a matter of law, that the flight of any particular period of time is sufficient to allow the voice of reason and humanity to be heard. No matter if it appears to the court that there has been such a lapse of time that it would be unreasonable to suppose passion had not cooled, it is within the prerogative of the jury to say that a period of time, no matter how long, is too short for reason to have fully reasserted its dominion under the circumstances of provocation. If, as declared by our legislature, the jury are in all cases to exercise the exclusive prerogative of adjudging whether the provocation is so equivalent to an assault as

to reduce the homicide from murder to manslaughter, and whether such equivalent provocation authorizes that supposedly irresistible impulse of passion which will mitigate a homicide, unless, in their judgment, a sufficient time has elapsed for the voice of reason and humanity to be heard (and there can be no doubt that this is the law), then certainly in the present case it was for the jury to say whether the deadly assault made by the defendant upon her husband was actuated by malice, or whether it was caused by burning anger and irresistible passion, primarily aroused by the beating given her a few hours before by her husband. This put it up to the jury to determine whether sufficient "cooling time" had elapsed, between the beating of the accused and the homicide, for reason and humanity to reassume their sway. There are sometimes circumstances which justly arouse an indignation which glows more ruddily with the passage of time (a passion which is not really "irresistible," as defined by law, until it passes from red to white heat), and by every rule of reason, as well as by the legislative enactment of 1899, the sufficiency of "cooling time" should be submitted to the jury; for the jury is composed of men of various minds, and generally includes those whose experiences have been attuned to different touches upon the varied and variant chords of human feeling. In the present case it is in evidence that the husband had beaten his wife only a few hours before the homicide. It is for the jury to say (and no court can gainsay their right so to adjudge) whether the assault upon the wife was a provocation which justified the excitement of a passion, which, instead of cooling during the hours which elapsed, momentarily increased as she reflected upon the wrong, and had only reached the point, at the time she used the razor, that she could no longer control her actions, and thus, for the first time, became in legal contemplation irresistible.

2. Exception is taken to the fact that the court did not charge the jury that if a witness was successfully impeached, the jury might disbelieve his testimony altogether, and that if the testimony of any witness was shown to be false in one material point, they might disbelieve him as to every other material matter in his testimony. So far as the charge of the court upon the subject of impeachment went, it was not only abstractly correct, but adjusted to the evidence. The court correctly stated the modes by which a witness might be impeached, and submitted to the jury the question

as to whether any witness had been successfully impeached. There was no request for instructions upon the subject of impeachment; and, since it is not reversible error for the court to omit entirely to charge upon the subject of impeachment, unless a request for instructions upon that subject is proffered, it must be held that the matter falls under the general rule that it will not be held, where the court correctly charged a pertinent principle of law, that it was error to omit additional instructions, not requested, on the same subject.

3. The plaintiff in error complains that the judge charged the jury, in substance, that if they believed the defendant was actuated by the fears of "a reasonable man," of a "man reasonably cool and courageous," she should be acquitted; it being alleged that this was error because the court should have adjusted the familiar legal principle to the sex of the person on trial, and have told the jury that if they believed that the defendant, as a "reasonable woman," apprehended that serious personal injury, amounting to a felony, was about to be committed upon her, she would be justified. It is argued that nature has designed woman upon a different model from man, and made her generally much more timorous by nature than man. It is not necessary for us to rule upon what would be the duty of a judge where a female is on trial and a request aptly adjusted to the facts of the particular case is presented. In the present case no request for a presentation of the defense in concrete form was made, and since, under the provisions of section 4, paragraph 3, of the Civil Code, the masculine embraces the feminine gender, the instructions of which complaint is made can not afford ground for a new trial. It may be assumed that a jury of ordinary intelligence, under the instruction that the defendant's fears were to be judged by the circumstances not as they really existed, but as they appeared to her, would take into consideration the subject of sex.

4. It appears from the 4th and 5th grounds of the motion for a new trial, as certified by the presiding judge, that sequestration of the witnesses was requested by counsel and ordered by the court. The court allowed Mr. S. P. Cox to remain in the court-room during the trial, to assist the solicitor-general, and no objection is taken by the plaintiff in error to this exception in the enforcement of the rule, which in any event was within the discretion of the court.

It appears from the record that Cox was the third witness who testified, and that he had heard the testimony of the first two witnesses for the prosecution, and it developed in the trial that, though a brother of the deceased was the nominal prosecutor, Cox appeared to be the only person actively interested in the prosecution. Cox admitted his interest, and that prior to the convening of the court he had gathered all the witnesses who were willing to respond to his invitation to his store, near the scene of the tragedy, and had questioned them and discussed with them "what they were going to stick to." The witnesses who attended agreed to stick to the recital of certain facts. All witnesses except Cox were ordered put under the rule of sequestration. As certified by the presiding judge (in the 4th ground of the motion), "S. P. Cox was the third witness who went upon the stand as a witness for the State. Later, and after Cox had been upon the stand, the solicitor-general left the room, carried Cox with him, and had an interview with the State's witness Riley Kelly, after which said Riley Kelly was tendered as a witness by the State, and whereupon counsel for the accused objected to the witness for the State, upon the ground that the State had violated the rule of sequestration, and the witness Cox, who had delivered his testimony and had heard others testify, had been in communication with the witness Riley Kelly. The solicitor-general then stated to the court that Cox had not spoken to the witness; that he alone had conferred with the witness as to his testimony; that though present, Cox had not spoken to the witness. Counsel still insisted that the witness had been rendered incompetent, and that his testimony should not be admitted. The court overruled this objection, and then and there made the following statement: 'If this man was killed on Mr. Cox's place, I consider it his duty to see it ventilated in court. I would not make this statement if the jury were present.' Counsel for the accused still objected to the witness and to the conduct of the State's counsel in carrying this assistant for a consultation with the witness." In the 5th ground of the motion for a new trial it is certified that "after the witness Riley Kelly had been allowed to testify over the objection of the defendant, . . the solicitor, desiring to call one Lewis Hightower, a witness, a brother of the man alleged to have been killed by the accused, arose from his seat, in the presence of the jury, called S. P. Cox, and they two went out together and

went to the sequestered witness, and held consultation with him as to his testimony which he was then about to be called to deliver. When this witness was offered, immediately counsel for the accused again objected to the witness, and contended that he should not be allowed to testify, after Cox had been present when he was consulted as to his testimony by State's counsel. Movant contended that no matter what actually took place, this conduct on the part of the actual and real prosecutor (Cox) and State's counsel was a violation of the rule; that it afforded Cox all that he needed to see that witnesses did not deviate from what they had previously agreed in consultations with him that they would 'stick to,' . . that the very presence of Cox would intimidate the witness and tend to compel him to 'stick' to what he previously agreed to 'stick to;' and urged the same objections which had been urged against the witness Riley Kelly; which objections the court then overruled, and permitted the said Lewis Hightower to deliver his testimony, and permitted the same to go to the jury and be considered by them."

As to the first witness, the solicitor-general made the statement that Cox, though present during his interview with the witness Hightower, did not say anything. As we view the various circumstances in the record, it was perhaps not necessary for Cox to say anything. His interest in the conviction of the accused was already known, because the witness was one of those who had already attended the conference of witnesses at Cox's store, and Cox was more than his employer, because he was the absent landlord's overseer. Upon his report to the employer alone depended the standing of this employee. As to the second witness, however, it was not even made to appear that Cox did not talk to the witness. The manner in which the right of either party to insist upon the separation of the witnesses shall be exercised is a matter within the sound discretion of the trial judge. Cases frequently occur in which it is impracticable that there shall be a complete sequestration of the witnesses. In other cases it is in the interest of justice that one or more persons, even though they be witnesses, be permitted to remain within the court for the purpose of assisting counsel in the conduct of the case, as well as in speeding the investigation. In any case where it is apparent that the right will be abridged to the manifest prejudice of either party, or even where there is a strong

probability that the result would be prejudiced by too great lib-
erality in the exercise of his discretion, as well as where there is
an absolute denial of the right accorded by section 1043 of the
Penal Code, this discretion, which as a general rule appertains to
the trial judge, may be abused. But the discretion of the trial
judge is applicable only in advance of and to prevent a violation,
or even a slight infringement, of sequestration. He has no dis-
cretion which allows him to forbid a witness to testify because the
sequestration has been violated. This court and the Supreme Court
have uniformly held that the judge may attach the witness for con-
tempt, and that the fact that the witness has heard the testimony,
has had communication with interested parties affecting the case,
and such matters, may affect the credit of the witness; but the
court could not sustain the objection of the defendant's counsel in
this case and exclude the testimony of the witness. Counsel should
have called the attention of the court to the fact that the prosecutor
was about to go to the room in which the witnesses were sequestered,
and called the attention of the court to the interest of the prosecu-
tor and his influence over the witnesses. It would then have been
the duty of the court to prevent any intercourse or interference with
the witnesses upon the part of the prosecutor. But the defendant's
counsel did not object to Cox's leaving the court-room the second
time, even when he knew he was going to the witness-room and to
the presence of the witnesses. The motion to exclude the witness's
testimony could not be granted.

5. The motion for a new trial contained the following assign-
ment of error: Because, during the trial, the State's witness,
Lewis Hightower, testified as follows: "Ed and Lizzie came to my
house on Saturday night before the killing on Sunday night, about
first dark. She came there again that night, between midnight and
day. We were asleep, and Hattie asked where it was she had went
away; said she just went under the foot of the bed in the other
room to April-fool us. And she said, 'Don't say anything to Ed
about she had gone off.' I saw her next day after I saw Ed. She
asked me did I tell Ed she had gone off that night,—had she left
the house, and I said 'Yes.' She said, 'I have been off and there
is no help for it.' She said if he found it out she didn't care a bit,
she said, and she went off,—that she had a man, and said, what it
took to satisfy her, she had it. She was nearly drunk, she acted

like." The defendant's counsel at this point interjected a question, the answer to which disclosed that the testimony of the witness related not to the night on which the deceased was killed, but to the previous night; and thereupon a motion was made to rule out· the testimony as to what took place on Saturday night, and the conversations between the witness and the accused on the Saturday night and Sunday before the killing Sunday night; to rule out the question which the witness had stated the third person asked the accused, and to exclude the testimony of the witness as to all the transactions, acting, and doings of the Saturday night before the killing, at a different time and place and not connected with the homicide. The court refused to grant the motion to exclude the testimony, ruling that "what the witness said that night and the next morning, I rule that as competent, but her condition that night is ruled out." It is evident that when the judge said that he ruled "what the witness said that night and the next morning" to be competent, he really intended to say that he refused to repel the testimony of the witness as to the night and morning preceding the homicide, to which objection had been made and which we have quoted, except that the court ruled out the witness's statement as to the defendant's drunkenness. The motion of the defendant's counsel to exclude the testimony was promptly made; and we think it should have been granted, because it was not a part of the res gestæ of the homicide, and it could have had no other effect than practically to put in evidence the character of the defendant when she herself had not put her character in issue. What Hattie (a sister-in-law of the deceased) was reported to have said to the accused, and her reply, were mere hearsay and clearly objectionable; and none of the testimony to which objection was made, as to what was said and done on the Saturday night preceding the night of the homicide, was connected therewith, either in point of time or causal connection. It does not clearly appear from the record that the occurrences of Saturday night were the cause of any dispute or quarrel between the accused and the deceased, though it may be suspected that the information of his wife's admission of infidelity, conveyed by his brother, was the cause of the beating which may have occasioned the homicide. So that the testimony which it was sought to exclude really shed no light on the transaction under investigation, and even if the beating was the cause of the homicide,

an inquiry into the reasons why the deceased beat his wife was useless and immaterial, because, if, as contended by the State, the defendant killed her husband in resentment for the beating, it would make no difference whether or not the husband was justifiable in the beating; if the defendant, in order to defend herself against such a beating as endangered life or limb, killed her husband, she would be justifiable; and if she killed him after the beating had ceased, whether the administration of this corporal punishment on the part of her husband was justifiable or not, she would be guilty either of voluntary manslaughter or of murder, according to whether the jury found that the homicide was committed under the influence of an irresistible impulse of passion, justified by the provocation given, or in deliberate revenge. The defendant's admission tended only to prove her guilt of one specific act of adultery; and even when it is allowable for the State to prove bad character, it can not be shown by proof of specific acts. It is very easy to see that this testimony was extremely prejudicial to the accused. By breaking down her character before the jury, her statement as to what occurred in the difficulty between her husband and herself, which resulted in the homicide, would be discredited, if not annihilated. Upon the ground of the motion for a new trial we think a new trial should have been granted; and the court's refusal to grant the motion should be reversed.

*Judgment reversed.*