### 6295.   BOOKER v. THE STATE.

1. The evidence as a whole authorized the instructions to the jury on the law of voluntary manslaughter.
2. The court did not err in omitting, in connection with the instructions touching the law of manslaughter, to charge that "provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder;" especially in the absence of a written request that this part of section 65 of the Penal Code be given in charge.
3. Failure to give an additional charge to the jury can not be taken advantage of by exception to a correct charge given.
4. There was ample evidence to authorize the verdict, and there is no substantial merit in any of the assignments of error.

DECIDED MAY 4, 1915.

Indictment for murder—conviction of manslaughter; from Mc-Duffie superior court—Judge Conyers presiding.    December 19, 1914.

*M. L. Felts,* for plaintiff in error.

*A. L. Franklin, solicitor-general, John M. Graham,* contra.

WADE, J.  The first and second grounds of the amendment to the motion for a new trial complain that the court erred in giving in charge to the jury section 65 of the Penal Code, relative to voluntary manslaughter (except the part relating to provocation by words, threats, menaces, etc., which was omitted), and in instructing them what the form of their verdict should be if they found the defendant guilty of manslaughter; the alleged error being that the evidence as a whole did not warrant any reference whatever to the law of voluntary manslaughter.

The killing occurred on Sunday at a negro camp-ground, where, one witness declares, there were present more than a thousand people.  Making due allowance for exaggeration, it is evident there were a large number of negroes at this meeting, some drawn there no doubt by religious fervor, some by their gregarious instincts alone, and still others by the opportunities always afforded at such gatherings to stir up trouble, settle old grudges, and render themselves, by noise and swagger, or even by violence and brutality, not only detestable to every law-abiding person present, but heroic and admirable in the opinion of the large and ignorant majority. Among others who, like Satan, "came also among them" (Job, 1, 6) were the slayer and his victim; and from some of the testimony, as well as from the statement of the accused, it appears they were both charged with satanic impulses when they arrived on the scene; for it is evident, from the statement of the accused, that he had with sufficient cause cherished a grudge against the deceased for about two years; and, from the conduct of the deceased as depicted by some of the witnesses, it may be inferred that he was filled to overflowing with black rage against the defendant, even before they encountered each other on this day so fatal to him. One of the witnesses for the State (who testified that he was a trustee of the church where the homicide occurred, and was an "officer" and "marshal" there on that day) stated that he saw the defendant a few minutes before the shooting, and that he was down at the "preacher's tent," and left Will Hall, the deceased, "down

there talking to the presiding elder and the bishop," and that, soon after, Hall came out and passed by the witness, and a few minutes later the fatal encounter occurred. To reconcile the conference between the deceased and his bishop and the presiding elder in the "preacher's tent" with the violent language and conduct ascribed to him by some of the witnesses so short a time thereafter is a task too difficult for the Caucasian mind. Out of the great number of those present many, doubtless, witnessed some part of the tragedy which marked that day in the way in which unfortunately so many religious gatherings of people of their race are distinguished, and at the trial many witnesses testified to what they saw or failed to see, so that the evidence as a whole is on some points confusion worse confounded. Without attempting to review even briefly the conflicting statements as to the fatal encounter, it is enough to say that there was testimony in behalf of the State from which the jury could have legitimately inferred that the deceased was walking away from the accused at the time of the shooting, and was making no effort whatever to inflict upon him any serious bodily injury, much less to commit a felony upon his person. On the other hand, there was some testimony which tended to justify the defendant altogether, and some which tended to show that the slayer and his victim engaged in mutual combat, urged thereto by a sudden and violent impulse of passion, and that the killing was free from any mixture of deliberation whatever.

The testimony of a witness for the defense showed that the deceased came up to the defendant, abused and cursed him, and told him that he (the defendant) had a pistol "but was afraid to use it;" and when the defendant replied that he was not afraid to use it, "they both started for their pistols, and Rob [the defendant] got his out first and shot him." The deceased "never did get his out until after Rob had done shot him, and after he shot him he had it in his hand." This witness further stated that both started to get their pistols out, but the defendant got his first, as he had his coat on his arm "and brought his pistol out from under his arm;" that the shirt of the deceased was open in front, and his pistol "was down in his shirt bosom," as she saw the handle, and it appeared as if he "got his hand hung," and therefore he did not get his weapon out as quickly as the defendant, but "he had it in his hand when he fell." There was testimony from other witnesses

for the defense which tended to corroborate this statement, and more than one testified that the deceased partially turned as the defendant fired, and this accounted for the fact that the ball from the defendant's pistol entered the back of the deceased near his backbone. Another witness said that when the shooting occurred the two parties were standing face to face, and that the deceased was shot in the back because "when Rob raised his pistol he [the deceased] whirled." Several of the witnesses corroborated the statement already referred to, that at the time the defendant shot Hall, Hall was trying to get his pistol out, and that the defendant, as they expressed it, simply "beat him to it." This testimony, narrated above, might rather indicate that the defendant shot to prevent the deceased from taking his life, and in so doing was acting under the fears of a reasonable man; but according to some of the evidence, immediately after the shooting, the defendant, in response to an inquiry why he had killed the deceased, said: "I got tired of that man running over me. He has been running over me for three years, and I got tired of it." And from the abuse which several witnesses say the deceased heaped upon the head of the defendant, coupled with the taunts which reflected upon his personal courage, it may be readily determined not only that the defendant intended to engage in a combat with the deceased, but also that this abuse excited his passion to the point where it became irresistible and absolutely controlled his conduct. The defendant, in his statement at the trial, recounted one gun fight and several other clashes between himself and the deceased, and told how the deceased had cursed, abused, and threatened him more than once, and had only a short time before the killing (apparently earlier in the same day) "fussed" with the defendant's wife and "stepped on her foot;" and he further asserted that the deceased, at the time of the killing, advanced upon him, and he retreated and admonished the deceased "to stand back and talk to" him; that the deceased said, "You got a pistol, aint you? . . I don't care if you have, you God damned son of a bitch, all you good for is to tell a lot of God damned lies," and ran his hand into his bosom, trying to get his pistol; whereupon the defendant pulled a pistol from under his coat, which he had on his arm, and fired.

The action of the deceased on the occasion of the homicide, in putting his hand on his pistol in his bosom, taken in connection

with his abusive language and his attitude towards the defendant at that time, though not sufficient to justify the homicide, might be regarded as an invitation to the defendant to engage in a combat with deadly weapons, and thereby render the homicide manslaughter. In the case of *Young* v. *State,* 10 *Ga. App.* 116 (72 S. E. 935), it was said: "Where a baseball player and an umpire become involved in a quarrel over a point in the game, and while the umpire is advancing towards the player with his hand in his pocket the player pulls a pistol and kills the umpire, a verdict finding the player guilty of voluntary manslaughter is not contrary to law, nor without evidence to support it." See also *Fallon* v. *State,* 5 *Ga. App.* 659 (63 S. E. 806); *Anderson* v. *State,* 14 *Ga. App.* 607 (81 S. E. 802); *Malone* v. *State,* 49 *Ga.* 217. Taking into consideration the statement of the accused as to the previous trouble between himself and the deceased, and the alleged conduct of the latter towards him and his wife, his passions may have been thereby aroused to the danger point; and it being a question for the jury whether there had been enough "cooling time" thereafter, they were authorized to find he was still under the influence of passion, which became irresistible when the deceased accused him of cowardice and "dared" him to draw his pistol, and attempted to draw his own pistol. It is clearly manifest that the judge committed no error in charging the law of manslaughter, and that the verdict was not contrary to law or without evidence to support it, as there was ample testimony from which the jury could determine that the killing came strictly under the definition of voluntary manslaughter.

It was entirely within the prerogative of the jury (Acts 1899, p. 41; Penal Code of 1910, § 65) to say that a period of time, no matter how long, was too short for reason to have reasserted its dominion under the circumstances of provocation shown in this particular case. In the case of *Hightower* v. *State,* 14 *Ga. App.* 248 (80 S. E. 684), Russell, C. J., speaking for the court, said: "There are sometimes circumstances which justly arouse an indignation which glows more ruddily with the passage of time (a passion which is not really 'irresistible,' as defined by law, until it passes from red to white heat), and by every rule of reason, as well as by the legislative enactment of 1899, the sufficiency of 'cooling time' should be submitted to the jury; for the jury is com-

posed of men of various minds, and generally includes those whose experiences have been attuned to different touches upon the varied chords of human feeling." Especially is this true where, as in the case now under consideration, the deceased used language at the time of the homicide not only sufficient to arouse passion, but calculated to add to and inflame passion already aroused by previous circumstances of provocation. Another case which seems to be in point is that of *Land* v. *State,* 11 *Ga. App.* 761 (76 S. E. 78). See also *Battle* v. *State,* 133 *Ga.* 185 (65 S. E. 382), and citations.

In the 3d ground of the amendment to the motion for a new trial it is complained that the judge erred in failing to charge, in connection with the instruction given as to the law of voluntary manslaughter, that "provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder;" or, in other words, that the judge erred in omitting these words when giving in charge to the jury section 65 of the Penal Code. This is a somewhat unusual complaint. Generally error is assigned in cases of this character because the trial judge gave in charge this part of section 65 without proper qualification, and it is somewhat refreshing to find an exception based not on the inclusion, but the exclusion, of this part of that section. It appears to be so difficult to instruct the jury, to the satisfaction of counsel for the accused, as to provocation by words, threats, menaces, etc., or so that no proper exception can be urged against such instruction, that this court said in *Holland* v. *State,* 3 *Ga. App.* 467 (60 S. E. 205), that "this phase of criminal law as codified is couched in such inapt language that in most cases the trial judge may safely run his pen through these words, when charging the manslaughter section." Again, in *Garner* v. *State,* 6 *Ga. App.* 788 (65 S. E. 842), it was said: "It is not usually a proper charge that 'provocation by words, threats, menaces, or contemptuous gestures shall in no case be sufficient to free the person killing from the guilt and crime of murder.' This is especially true where there is a theory of the evidence on which the jury might find that the person killing acted in apparent self-defense, on account of a reasonable fear aroused in his mind by threats, menaces, etc., taken in connection with other facts in the case." See, in this connection, *Cumming* v. *State,* 99 *Ga.* 662 (37 S. E. 177). Often when this part of section 65 is charged excep-

tion is taken; and in the case under consideration exception is taken because it was not charged. Without meaning to be flippant, the exception taken to the failure to charge these words suggests the thought that perhaps counsel may have reasoned that "it's a poor rule that won't work both ways;" but in defiance of the maxim, we must hold that this rule will only work *one* way—in this instance, at least. It may be said further, in regard to this exception, that there was no timely request in writing to charge the law relative to provocation by words, threats, etc.; and since, under former rulings of this court, it is ordinarily best for a trial judge to "draw his pen" through these particular words in the statute, it is evident that no valid assignment of error can be based upon the failure of the judge to give instructions in regard thereto, without such a written request.

The 4th and last ground of the amendment to the motion for a new trial alleges that the court erred in charging that "if the guilt of the accused is shown to the satisfaction of the jury, they are authorized to convict him, regardless of any good character on his part, but the jury are authorized to consider his good character, if it has been shown." The error complained of is that this charge fails to instruct the jury as to the amount of consideration which proof of good character should have at their hands. The exception does not complain that the charge given was incorrect or misleading; and we may not consider an exception taken to a correct charge, merely because the judge failed to give some additional charge on the subject, where no proper written request was made. However, the point raised by this exception appears to be controlled by the following cases: *Maddox* v. *State,* 9 *Ga. App.* 448 (71 S. E. 498); *Mosley* v. *State,* 11 *Ga. App.* 303 (75 S. E. 144); *Keys* v. *State,* 112 *Ga.* 392 (5), 397 (37 S. E. 762, 81 Am. St. R. 63); *Scott* v. *State,* 137 *Ga.* 337 (73 S. E. 575).

*Judgment affirmed.*